## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JENNIFER CASCIO,

      Plaintiff,

v.                                   Case No: 2:15-cv-719-FtM-CM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

### ORDER

Plaintiff Jennifer Cascio seeks judicial review of the denial of her claim for disability, disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed the record, the briefs, and the applicable law.   For the reasons discussed herein, the decision of the Commissioner is **AFFIRMED**.

### I.    Issues on Appeal[1]

Plaintiff raises three issues on appeal: (1) whether substantial evidence supports the determination of the Administrative Law Judge ("ALJ") concerning Plaintiff's Residual Functional Capacity ("RFC"); (2) whether the ALJ properly evaluated the opinions of Plaintiff's treating and consultative physicians; and (3) whether the ALJ's credibility assessment of Plaintiff is supported by substantial evidence.

---

[1] Any issue not raised by Plaintiff on appeal is deemed to be waived. *Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013) ("'[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.'") (citing *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004)).

## II.   Procedural History and Summary of the ALJ's Decision

On May 27, 2011, Plaintiff filed applications for disability, DIB and SSI alleging a disability onset date of June 25, 2007.   Tr. 176-94.   Plaintiff alleged disability due to mental illness, panic attacks, severe depression and schizophrenia. Tr. 210.   The applications were denied initially and upon reconsideration.   Tr. 63-91, 94-118. Plaintiff requested and received a hearing, which was held telephonically[2] before ALJ John R. Daughtry on December 17, 2013.   Tr. 28-61.   Plaintiff was not represented by counsel during the hearing.[3]   Tr. 31.   Plaintiff and a vocational expert ("VE") testified at the hearing.   *Id.*

On February 21, 2014, the ALJ issued a decision finding Plaintiff not disabled from May 10, 2011 through the date of the decision.   Tr. 11-21.   At step one, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful activity since May 10, 2011.   Tr. 14.   At step two, the ALJ determined that Plaintiff has the following severe impairments: major depressive disorder with psychotic features.   *Id.*   At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   Tr. 15.   The ALJ then determined that

---

[2] The hearing originally was scheduled for September 10, 2013, in Naples, FL, but Plaintiff instead requested she attend the hearing by telephone from her home in Ft. Myers, FL. Tr. 11.   The day of the scheduled hearing, the ALJ could not reach Plaintiff by telephone; thus he *sua sponte* postponed the hearing.   The hearing was rescheduled for December 17, 2013, again by telephone at Plaintiff's request.   The ALJ presided over the hearing from Franklin, TN, and the vocational expert also appeared and testified in Franklin.   *Id.*

[3] The ALJ explained to Plaintiff her right to counsel; yet she elected to proceed without representation.   Tr. 30-31.

Plaintiff has the RFC to perform the full range of work in all exertional levels, but with the following nonexertional limitations:

> [Plaintiff] can understand, remember, and carry out simple, routine directions; she can make judgments on simple, work-related decisions; she can have occasional interaction with the general public, supervisors and co-workers; she may require direct, non-confrontational supervision; and she can adapt to infrequent workplace changes.

*Id.* at 16.   Next, the ALJ found Plaintiff is unable to perform any past relevant work as a cashier/checker and front desk clerk.[4]   Tr. 19.   Considering Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform and therefore concluded she has not been under a disability from June 25, 2007 through the date of the decision.   Tr. 20-21.

### III.    Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).   The Commissioner has established a five-step sequential analysis for evaluating a claim of disability.   *See* 20 C.F.R. §416.920.   The Eleventh Circuit has summarized the five steps as follows:

---

[4] Both these jobs are classified as semi-skilled work at the light exertional level.   Tr. 19. Using the skill level definitions for specific vocational preparation ("SVP") time in 20 CFR 404.1568 and 416.968, semi-skilled work corresponds to an SVP of 3-4.   SSR 00–4p, 2000 WL 1898704 at *3.   The cashier/checker position has an SVP of 3 and the front desk clerk position an SVP of 4.   Tr. 19.

(1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy."

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (citing 20 C.F.R. §§ 416.920(a)(4), (c)-(g), 416.960(c)(2); *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011)). The claimant bears the burden of persuasion through step four; and, at step five, the burden shifts to the Commissioner. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).

The Eleventh Circuit recently has restated that "[i]n determining whether substantial evidence supports a decision, we give great deference to the ALJ's fact

findings." *Hunter v. Soc. Sec. Admin., Comm'r,* 808 F.3d 818, 822 (11th Cir. 2015) (citing *Black Diamond Coal Min. Co. v. Dir., OWCP,* 95 F.3d 1079, 1082 (11th Cir. 1996)). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings). It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Lacina v. Commissioner,* 2015 WL 1453364, at *2 (11th Cir. 2015) (citing *Grant v. Richardson,* 445 F.2d 656 (5th Cir.1971)).

## IV. Relevant Medical Evidence

### a. *Plaintiff's treatment records*

Plaintiff's mental health records begin with an emergency room visit on December 7, 2008 for increased depression and anxiety symptoms and impulsive behavior at three months postpartum, in which she was involuntarily placed in inpatient mental health treatment under Florida's Baker Act[5] and hospitalized for 9 days. Tr. 442-53. Although previously she had been prescribed Lexapro, Plaintiff was

---

[5] Fla. Stat. § 394.467.

not taking it regularly because she stated she was hiding it out of concern someone in her family would steal it.    Tr. 442.    On discharge, Plaintiff was prescribed Haldol twice daily and told to follow up with outpatient mental health treatment.    Tr. 341, 445.

On January 15, 2009, Plaintiff was seen at Lee Mental Health Center by psychiatrist Clark Dreilinger, M.D., also whom had seen her when she was hospitalized in December for episodes of aggressive behavior, such as wrecking her husband's car. Tr. 341-42.    According to her husband, Plaintiff was off her medication at that time. Tr. 346.    Plaintiff told Dr. Dreilinger that she was doing well and felt in control.    Tr. 341.    On examination, Plaintiff was awake, alert and oriented in all spheres; had no hallucinations, suicidal or homicidal ideations; and had no paranoia or other psychotic features.    *Id.*    Her insight and judgment were "fairly good," and her cognition was within normal range.    *Id.*    Plaintiff was diagnosed with psychosis in remission, and assigned a GAF[6] of 55.[7]    *Id.*    Dr. Dreilinger noted that "[w]ithout routine medical visits to ensure compliance and appropriate intervention, this client will show (or has in the past shown) significant cognitive, emotional and behavioral deterioration."    *Id.* The plan was to continue Plaintiff on her present medication of the Haldol twice daily and add Cogentin twice daily.    Tr. 342.

Plaintiff was seen for follow-up on February 5, 2009, and stated she was doing relatively well with the exception of increased anxiety, which Dr. Dreilinger noted was

---

[6] Global assessment of function (GAF) is a numeric scale (0 through 100) mental clinicians use to rate social, occupational and psychological functioning. See American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 33 (4th ed. 1994) (DSM IV).

[7] A GAF score of 51 to 60 indicates moderate symptoms or moderate impairment in social, occupational, or school functioning. DSM IV.

"reality based" because of antisocial behavior by her oldest son, financial pressures and anxiety about the well-being of her youngest child. Tr. 339. He further noted her anxiety "does not reach the level of being psychotic at all." *Id.* Plaintiff also stated she was tired in the daytime from the medication. *Id.* On examination, Plaintiff's mood was somewhat anxious; her affect basically full, although slightly restricted; and she had no suicidal or homicidal issues, auditory or visual hallucinations or delusions. *Id.* Dr. Dreilinger noted that Plaintiff's insight and judgment were "pretty good," her cognition was within normal range, and she appeared to be acting "in a very rational way." Tr. 339-40. He decreased Plaintiff's antipsychotic medication and referred her to outpatient therapy to deal with her anxiety and reality-based issues and allow her better ways of coping with her home situation. Tr. 340. Dr. Dreilinger diagnosed Plaintiff with psychosis, not otherwise specified, in remission, and rule out: anxiety disorder, adjustment disorder with anxiety (reality based) and schizophrenia, chronic, paranoid type, in remission. *Id.*

Plaintiff's next mental health treatment was approximately three months later, when she presented to Lee Mental Health Center on May 10, 2010 for anxiety and depression. Tr. 346. Plaintiff stated that she got angry because of her postpartum depression, had an outburst and got arrested. *Id.* After four days of inpatient treatment, Plaintiff's grooming was noted as "fair," her eye contact was good, she had fair insight and judgment, denied suicidal or homicidal tendencies, had appropriate affect and was oriented in all spheres. Tr. 332-38. Her GAF was 70.[8] Tr. 338.

---

[8] A GAF score of 61 to 70 indicates mild symptoms or mild impairment in social, occupational, or school functioning. DSM IV.

Plaintiff next was seen on June 15, 2010 by psychiatrist Gregory G. Young, M.D., during which Plaintiff stated she was feeling less depressed and was benefitting from the Lexapro prescribed by Dr. Fowler the previous month.  Tr. 273.  Dr. Young also noted Plaintiff reported feeling less stress concerning her 20-year-old son, who Plaintiff reported was overusing drugs and had chronic anxiety and other issues.  *Id.*  Plaintiff was well groomed, alert and oriented; her behavior was normal; and she was cooperative.  *Id.*  Her affect was appropriate, her thought processes were goal-directed, and her insight and judgment were fair.  *Id.*  Plaintiff mainly was concerned with how to handle interaction with her son, whom she believed needed long-term treatment.  *Id.*  Dr. Young diagnosed Plaintiff with major depression with psychotic features and a GAF of 60, noting he advised her to be realistic concerning interaction with her son, continued her on 10 mg. of Lexapro, and requested that she follow-up in four weeks.  Tr. 274.

Instead, Plaintiff returned more than two months later, in late August 2010, during which Dr. Young noted that she had far less stress concerning her son, although she reported her husband had an addiction problem.  Tr. 275.  Plaintiff again reported that she was benefitting from the Lexapro.  *Id.*  Upon a mental status examination, Plaintiff was well-groomed, appropriate and cooperative; her behavior was normal.  *Id.*  Plaintiff's thought processes were goal-directed, and her insight and judgment were good.  *Id.*  She had no suicidal or homicidal ideas, and Dr. Young noted that Plaintiff "feels she benefits from being able to put her health as her number one priority."  *Id.*  Dr. Young assigned Plaintiff a GAF of 60, continued her on the Lexapro, and stressed the importance for Plaintiff to follow up on her own health.  Tr. 276.  He requested that she return in four to six weeks.  *Id.*

On September 13, 2010, and before her next appointment with Dr. Young, Plaintiff again was involuntarily hospitalized at Lee Mental Health Center for three days because she said there was a great deal of drug using going on at her house, the police were called several times, and they believed she was delusional.   Tr. 263-65. Her GAF on admission was 55, and treating psychiatrist Dr. Gharda-Ward noted that Plaintiff was being treated with Lexapro.   Tr. 264.   The psychiatrist ordered Plaintiff "re-started" on Lexapro the following morning and also added Seroquel (200 mg.) to help her sleep.   Tr. 265.   Plaintiff showed improvement each day of her hospitalization, and on discharge Plaintiff was diagnosed with major depressive order with psychotic features and a GAF of 60.   Tr. 263.

Plaintiff's next treatment was four months later, when she visited Dr. Young on January 19, 2011.   Tr. 277.   Plaintiff told Dr. Young she was feeling depressed and was living in a "very disruptive environment," with a husband who was overusing drugs and driving without a license, and a two-year-old daughter with whom she was worried about leaving in her husband's care.   *Id.*   Plaintiff said she had been hospitalized in Naples for about one week, and on discharge was given 80 mg. of Geodon, which she stopped taking because it caused her tremors.   *Id.*   She told Dr. Young that her 21-year old son was doing better and using drugs to a lesser extent, but she had no structure or support from her family.   *Id.*   On examination, Plaintiff was well-groomed and cooperative, with thoughts that initially were disorganized but improved during the course of the appointment.   *Id.*   Plaintiff's insight and judgment were fair, and again she stated she was benefitting from Lexapro.   *Id.*   Plaintiff was diagnosed with major depressive disorder with psychotic features because of her stressful environment and

given a GAF of 50.[9]  *Id.*  Dr. Young increased Plaintiff's Seroquel to twice daily, and she was told to continue on 20 mg. of Lexapro, an increase from the 10 mg. prescribed in September 2010, and to follow up with him in four weeks.   Tr. 265, 278.

Plaintiff returned to Dr. Young two months later on March 30, 2011, in which she reported being depressed but still felt she was benefitting from the Lexapro.   Tr. 279. She said there was not much change in her disruptive family and home environment, and in fact that it had worsened, with her father having been Baked Acted and, after his hospitalization, moving in with her, among the ongoing issues with her sons.   *Id.* On examination, Plaintiff appeared less depressed, and her thoughts were more organized.   *Id.*   Still, Dr. Young diagnosed her with major depressive disorder with psychotic features, noting she was in a stressful, disruptive environment, and assigned her a GAF of 50.   *Id.*   He decreased Plaintiff's Seroquel, however, to once instead of twice daily, continued her Lexapro at bedtime, and told her to return in four to eight weeks.   Tr. 280.

At Plaintiff's appointment on June 1, 2011, she reported feeling overwhelmed by her disruptive environment, with her husband in jail and her son's drug use.   Tr. 290. Nonetheless, she reported feeling less depressed.   *Id.*   Dr. Young assessed a GAF of 45, yet continued Plaintiff on the same medications.   *Id.*   He recommended that she return in 60 days.   *Id.*   At her next appointment on July 13, 2011, Plaintiff reported the same disruptive environment at home, and in addition that she was financially stressed because her electricity had been turned off.   Tr. 286.   Dr. Young again assessed a GAF

---

[9] A GAF score of 41 to 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. DSM IV.

of 45 and recommended Plaintiff take 20 mg. of Celexa, .5 mg. of Clonazepam, and 50 mg. of Doxepin, and return to see him in two weeks.   *Id.*

Instead, Plaintiff returned about four weeks later, on August 17, 2011.   Tr. 282. Dr. Young again assessed a GAF of 45, but noted that Plaintiff felt less depressed and was planning to file for divorce and seek employment.   *Id.*   He recommended that Plaintiff take only the Doxepin for sleep and that she return in 30 days.   *Id.*

Again, Plaintiff did not return to Dr. Young as recommended, and instead it was nearly eight months later, on April 3, 2012, when she returned for follow-up treatment. Tr. 316-19.   During this visit, Dr. Young reported that Plaintiff was on *no* medications. Tr. 316.   Plaintiff's judgment and insight were poor; she was experiencing delusional, circumstantial, paranoid, bizarre and racing thoughts, although she denied having suicidal or homicidal thoughts; and her mood/affect was depressed and flat.   Tr. 315-19.   Dr. Young prescribed Plaintiff 50 mg. of Depakote.   Tr. 319.

The following month in late May 2012, Plaintiff was hospitalized at Park Royal Hospital for six days for complaints of depression, feelings of hopelessness and helplessness and paranoia.   Tr. 297.   On admission, Plaintiff was assessed a GAF of 20.   *Id.*   She was prescribed a number of medications during her stay and on discharge, including Effexor, Depakote, Risperdal and Xanax.   Tr. 297-98.   Plaintiff's condition improved during her stay, and she attended group therapy to discuss her marital situation.   Tr. 297.   On discharge, Plaintiff was alert and oriented, her affect was euthymic, and there was no evidence of a thought disorder.   Tr. 298.   She was assessed a GAF of 50.   Tr. 297.   Plaintiff was "reinstructed" that she would need ongoing treatment for her mental health issues.   *Id.*

Plaintiff voluntarily admitted herself for inpatient psychiatric care in early June 2012, claiming she was sleep-deprived, and she was living with "drug addicts" who were not giving her any help and whose behavior was worsening.   Tr. 359.   She stated she had been taking her medications, despite allegations to the contrary by the police officers.   Tr. 359.   Although Dr. Young continued Plaintiff on the same medications, he noted Plaintiff's judgment and insight were poor, and she had delusional, circumstantial, paranoid, bizarre and racing thoughts.   Tr. 362-65.   He assessed a GAF of 45.   Tr. 364.   During a visit later that month, Dr. Young continued Plaintiff on the same medications and recommended she increase her dosage of Xanax.   Tr. 353. Again he assessed a GAF of 45.   *Id.*   Plaintiff made one more visit to Dr. Young in July 2012, during which the psychiatrist's diagnoses and recommendations remained unchanged from the earlier visits.   Tr. 351-54.

Plaintiff's next mental health visit was in January 2013 for medication management, during which psychiatrist Dr. Rodriguez-Conn reported Plaintiff's insight and judgment were fair; her thoughts/perceptions tangential, circumstantial and paranoid; and her mood/affect depressed and constricted.   Tr. 392.   Plaintiff discussed her concern of relapse of her psychotic symptoms because of her life stressors, particularly her husband's abusive behavior and drug use.   Tr. 391, 393.   Dr. Rodriguez-Conn recommended that Plaintiff *restart* Risperdal and continue taking Depakote and Effexor.   Tr. 394.

In February 2013, Plaintiff was involuntarily committed to inpatient care in the crisis stabilization unit of Lee Mental Health Center for her anger and paranoia.   Tr. 372.   Plaintiff described her situation as follows:

> I'm just overwhelmed by my problems.   My family is trying to make me
> look bad.   My in-laws are trying to take my daughter away from me.   I'm
> definitely angry about it.   I don't feel like I can fight it much longer.   I
> need to have my medication changed so that it will help me more. . . . My
> thoughts are racing.   I can't focus on anything.   I'm paranoid.   I need
> help.

Tr. 374.   She also stated that her medication "is not working.   I've been on anti-depressants . . . forever.   I keep waking and can't sleep."   Tr. 378.   Plaintiff's insight and judgment were poor, and she was experiencing many "severe stressors," which were thought to be caused at least in part by her mental health history and other life stressors, including that her four-year-old daughter had been taken away from her, she had not heard from her parents and one of her sons had been "beaten up several times." *Id.*   Dr. Howard Layman diagnosed Plaintiff with bipolar disorder, not otherwise specified, and began treating her with Trileptal, which improved Plaintiff's condition sufficiently to discharge her two days later with referral to continue outpatient care. Tr. 372-76.

### b. *Consultative physician reports*

On October 27, 2011, state agency psychologist Thomas Conger, Ph.D., reviewed Plaintiff's medical evidence and determined in his psychiatric review technique ("PRT") assessment that Plaintiff was mildly restricted in activities of daily living ("ADLs") and moderately limited in difficulties in maintaining social functioning and concentration, persistence or pace.   Doc. 75.   Dr. Conger further found that Plaintiff had no repeated episodes of decompensation of extended duration.   *Id.*   He opined that although Plaintiff may continue to experience some depression at times, "she acknowledges the mental ability to perform routine ADLs independently, if motivated, and her input is

judged to be fully credible and is confirmed by a 3rd party source." *Id.* Dr. Conger also found that Plaintiff can relate in a socially appropriate manner, and recent treatment notes confirmed improvement in her condition. *Id.* He concluded: "Based on the totality of evidence, she is judged to be mentally capable of performing simple, routine tasks on a sustained basis and there is no indication of a mental impairment that would meet or equal any listing at this time." *Id.* At the same time, Dr. Conger also performed a mental RFC assessment for Plaintiff and, consistent with the PRT assessment, found:

> Although the claimant's condition may result in some concentration problems at times, she is mentally capable of performing routine tasks on a sustained basis, if motivated. Her condition may also result in some social difficulties as well as a negative reaction to criticism at times but she shows the ability to relate effectively in general. She is judged to have adequate understanding and overall adaptation abilities.

Tr. 77.

Following the administrative hearing on January 20, 2014, psychologist Paula Bowman, Psy.D., performed a psychological evaluation of Plaintiff, both interviewing Plaintiff and reviewing her medical records. Tr. 455-59. Plaintiff was accompanied by her stepfather. Tr. 455. Dr. Bowman began her report stating, as background history:

> It is important to note that although many of the claimant's statements sounded delusion[al], the stepfather corroborated all the statements, stating that she was telling the truth as he had been present for most of these instances.

*Id.* Dr. Bowman summarized Plaintiff's psychiatric history, noting that while Plaintiff had received psychiatric and psychological treatment, on and off, since the mid-1990s and up until 2013, she was not presently receiving psychiatric or psychological

- 14 -

treatment.   Tr. 456.   Upon examination, Dr. Bowman found Plaintiff's demeanor and responsiveness to questions somewhat cooperative and her manner of relating, social skills and overall presentation fair.   Tr. 457.   Plaintiff was appropriately dressed and made appropriate eye contact; her thought process were tangential and marked by delusions; her mood was somewhat anxious; she was oriented on all spheres; her attention, concentration and memory skills were mildly impaired; and her insight and judgment were limited.   Tr. 447-58.   Plaintiff discussed unreasonable restrictions placed on her at home by her husband, such as when she is permitted to shower, do laundry or grocery shop.   Tr. 458.   With respect to Plaintiff's ability to work, Dr. Conger opined:

> Vocationally, the claimant can follow and understand simple directions and instructions. She can perform simple tasks independently. She has mild difficulty maintaining attention and concentration. She has mild difficulty maintaining a regular schedule. She has mild difficulty learning new tasks. She can perform complex tasks independently. She has moderate difficulty making appropriate decisions. She has moderate difficulty relating adequately with others. She has moderate to marked difficulty appropriately coping with stress. Difficulties are caused by symptoms related to depression and anxiety.

Tr. 458-59.   Dr. Conger recommended that Plaintiff receive psychiatric and psychological treatment, and opined that Plaintiff's prognosis was fair with the appropriate intervention.   Tr. 459.

## V.     Discussion

### a. Whether the RFC is supported by substantial evidence

Plaintiff first argues that the ALJ's RFC determination is erroneous because the ALJ improperly considered Plaintiff's record of mental health treatment and selectively focused on evidence supporting denial of her disability application.   Doc. 18 at 7.   The Commissioner responds that substantial evidence supports the ALJ's finding that, despite infrequent and relatively short periods of decompensation, Plaintiff could perform the work outlined in the RFC when she complied with recommendations for regular psychotherapy and medication management.   Doc. 19 at 9.   Having reviewed the record and controlling authority, the Court finds substantial evidence supports the ALJ's RFC assessment.

The RFC is the most that a claimant can do despite her limitations.   *See* 20 C.F.R. § 404.1545(a).   At the hearing level, the ALJ has the responsibility of assessing a claimant's RFC.   *See* 20 C.F.R. § 404.1546(c).   The ALJ is required to assess a claimant's RFC based on all of the relevant evidence in the record, including any medical history, daily activities, lay evidence and medical source statements.   20 C.F.R. § 404.1545(a).   The claimant's age, education, work experience, and whether she can return to her past relevant work are considered in determining her RFC, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)), and the RFC assessment is based upon all relevant evidence of a claimant's ability to do work despite her impairments.   *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).

Here, the ALJ found that Plaintiff was unable to perform work at all exertional levels because of her nonexertional limitations.   Tr. 20.   The ALJ added limitations to her RFC, as noted, limiting Plaintiff to work that involves simple routine directions and judgments; only occasional interaction with the general public, supervisors and co-workers; direct, non-confrontational supervision; and infrequent workplace changes. Tr. 16.   Accordingly, he considered the testimony of a vocational expert to determine what jobs existed in the economy that Plaintiff was able to perform.   Tr. 20-21.   The Court finds the ALJ applied the correct legal standards, and his determination is supported by substantial evidence.   *McRoberts*, 841 F.2d at 1080.

Plaintiff disputes the ALJ's finding that Plaintiff's severe mental health symptoms generally are controlled when she is compliant with her medications and mental health treatment.   Doc. 18 at 8; Tr. 17.   Plaintiff asserts, to the contrary, the medical evidence shows that Plaintiff's condition is "poorly controlled resulting in multiple inpatient admissions despite her compliance with treatment."   Doc. 18 at 8. The Court disagrees.   As set forth in detail, *supra*, substantial evidence supports the ALJ's determination that Plaintiff was not compliant with her recommended treatment; and, when she received regular mental health treatment and was medication-compliant, her condition improved substantially.   The record also indicates that a good deal of Plaintiff's issues were situational-based, because of family issues, and she was routinely recommended to see mental health counseling to help her cope with these stressors, but neglected to do so.

For example, Plaintiff's initial mental health treatment record of December 7, 2008 indicates that Plaintiff had been prescribed Lexapro, but was hiding it and thus

not taking it regularly.   Tr. 442.   This fact was confirmed by Plaintiff's husband.   Tr. 346.   Plaintiff was told at that time to follow up with outpatient mental health treatment.   Tr. 341, 445.   The following month, Plaintiff told her psychiatrist she was doing well and felt in control.   Tr. 341.   Her GAF of 55 indicated only moderate symptoms, and her psychosis was in remission.   *Id.*   Plaintiff was told that without routine medical visits "to ensure compliance and appropriate intervention," Plaintiff had and would continue to show "significant cognitive, emotional and behavioral deterioration."   *Id.*   Although during her visit in February 2009 Plaintiff showed increased anxiety, it did not rise to the level of being psychotic; and Plaintiff's insight and judgment were noted as "pretty good" and she was behaving "very rational[ly]."   Tr. 339.   Her psychiatrist, Dr. Dreilinger, decreased her antipsychotic medication.   Tr. 340.   He noted her increased anxiety was "reality-based" because of her family and financial pressures, and referred Plaintiff to outpatient therapy to find better ways to cope with these issues.   *Id.*

There is no record that Plaintiff complied with his recommendation of outpatient therapy, and, predictably, three months later in May 2010, Plaintiff was back in inpatient treatment.   Tr. 346.   Again, with treatment, Plaintiff's condition significantly improved, and at the end of her stay she was assessed a GAF of 70, indicating mild symptoms or impairment.   Tr. 338.   In a follow-up appointment one month later with Dr. Young, Plaintiff reported she was less depressed because of the Lexapro she was taking since her treatment in May.   Tr. 273.   Contrary to Dr. Young's advice that Plaintiff return in four weeks, however, Plaintiff waited over two months for her follow-up visit.   Tr. 275.   At that time she still appeared to be taking her Lexapro

and reported benefitting from it.   *Id.*   Dr. Young recommended Plaintiff return in four to six weeks, and once again Plaintiff did not comply.   Tr. 276.   Instead, three months later, in September 2010, Plaintiff again was involuntarily committed for "delusional" behavior.   Tr. 263-65.   It is unclear whether Plaintiff had been compliant with her medication, as the record contains an order from her treating psychiatrist she should be "re-started" on Lexapro, possibly indicating that Plaintiff had not been taking it.   Tr. 265.   In addition, with the administration of her medications, Plaintiff showed improvement, which also is an indication that Plaintiff may not have been taking it regularly when she was admitted.   Tr. 263.

The pattern continued, and Plaintiff did not return for treatment to Dr. Young for four months, until January 2011.   Tr. 277.   Nonetheless, Plaintiff said she was benefitting from the Lexapro.   *Id.*   Dr. Young increased her dosage because of her stressful home situation, and told her to return in one month.   Tr. 265, 278.   Again, instead, she returned two months later, at which time she still said she was depressed but benefitting from the Lexapro.   Tr. 279.   Plaintiff appeared less depressed; thus Dr. Young decreased one of her medications and told Plaintiff to return in four to eight weeks.   Tr. 280.   In her next visits in June and July 2011, Plaintiff complained about her disruptive home environment, yet reported feeling less depressed during the first of these visits.   Tr. 286, 290.   In the June visit, Dr. Young assessed a GAF of 45, yet he continued Plaintiff on her same medications.   Tr. 290.   In the second of these two visits, with Plaintiff's GAF still at 45, Dr. Young added other medication to Plaintiff's regimen and told her to return to see him in two weeks.   Tr. 286.   Instead, Plaintiff

returned in one month, during which she said she was less depressed.   Tr. 282.
Nonetheless, Dr. Young still assessed Plaintiff's GAF at 45.   *Id.*

In the August 2011 visit, Dr. Young requested that Plaintiff return in 30 days,
yet she did not return for another nearly eight months, at which time the record
indicates she was taking no medications whatsoever.   Tr. 316.   Not surprisingly,
Plaintiff's mental condition had deteriorated.   Tr. 315-19.   She was hospitalized about
a month later, in May 2012, given medications that improved her GAF from 20 to 50,
and on discharge was "reinstructed" that she needed ongoing treatment for her mental
health issues.   Tr. 297-98.   Plaintiff voluntarily admitted herself the following month
in early June 2012, because of her home situation.   Tr. 359.   Although she said she had
been taking her medications, the record states that police officers disputed this
allegation.   *Id.*   Her GAF was 45 at that time and during a follow-up visit later in the
month, the latter of during which Dr. Young increased Plaintiff's dosage of Xanax.   Tr.
353, 362-64.   In Plaintiff's final visit to Dr. Young in July 2012, he noted no changes to
his diagnoses and treatment from the earlier visits.   Tr. 351-54.

Several months passed before Plaintiff sought treatment for her mental health
issues, in January 2013.   In that visit, the Dr. Rodriguez-Conn recommended that
Plaintiff restart her Risperdal, indicating that she had not been taking it as prescribed.
Tr. 392.   The following month, Plaintiff again was involuntarily committed for
inpatient mental health treatment, stating she was "overwhelmed" by her problems and
family situation and needed changes to her medication, because it was not working.   Tr.
374, 378.   Plaintiff's condition improved within two days after treatment.   Tr. 372-76.

Consistent with the ALJ's findings and discussed by the Commissioner, these facts and the timing of Plaintiff's inpatient hospitalizations demonstrate that Plaintiff's condition generally remained stable when she was receiving regular treatment.   Doc. 19 at 11.   As acknowledged by the Commissioner, Plaintiff points out that the ALJ erroneously noted that Plaintiff's GAF scores in 2010 and 2011 ranged from 55 to 60, when in reality there were scores during that time period below that range.   Tr. 17; Doc. 18 at 10; Doc. 19 at 11.   But the Court agrees with the Commissioner that this misstatement is at most a harmless error, as substantial evidence supports the ALJ's determination that Plaintiff's condition generally was controlled when she was compliant with her medications and recommended treatment.   *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir.1983) (holding that ALJ's erroneous statements of fact were harmless error because the mistakes did not affect ALJ's ultimate conclusion); *Singleton v. Comm'r of Soc. Sec.*, No. 6:12-cv-683-Orl-GJK, 2013 WL 5236678, at *2 n.2 (M.D. Fla. Sept. 17, 2013) (finding harmless an ALJ's misstatement of environmental limitations because the outcome would not change absent the error). Doc. 19 at 11.   Moreover, as noted by the Commissioner and the ALJ in his decision, GAF scores are no longer endorsed for use in disability programs by the Commissioner.   *See Lacina,* 606 F. App'x at 527, DSM IV); Doc. 19 at 12; Tr. 19.   Even if GAF scores are an adequate diagnostic tool, many of Plaintiff's GAF scores are not probative of her ability to work because assessment occurred generally when she was not taking her medications, and the addition of medications and therapy considerably improved Plaintiff's scores.

In addition, the opinions of the consultative physicians support the ALJ's opinion, and are consistent with the RFC the ALJ determined.   In October 2011, Dr. Conger

found that Plaintiff was mentally capable of performing routine tasks on a sustained basis if motivated; and, while her condition may at times result in some social difficulties and negative reaction to criticism, Plaintiff had the ability to relate effectively and had adequate understanding and overall adaptation abilities.   Tr. 77.   In her psychological evaluation performed in January 2014, Dr. Bowman opined that many of Plaintiff's earlier statements – which a number of prior treating physicians had considered delusional – actually were corroborated; and Dr. Bowman determined instead that Plaintiff was telling the truth.   Tr. 455.   Consistent with the ALJ's RFC and Dr. Conger's assessment, Dr. Bowman found that Plaintiff could follow and understand simple directions and could perform simple tasks independently, and had only mild difficulty maintaining attention and concentration, maintaining a regular schedule and learning new tasks.   Tr. 458-59.   Further, she opined that Plaintiff can perform complex tasks independently.   *Id.*   While Dr. Bowman also noted that Plaintiff has moderate difficulty making appropriate decisions and relating adequately with others, and moderate to marked difficulty appropriately coping with stress because of her depression and anxiety, the Court finds that the RFC determined by the ALJ accounts for these limitations, particularly when Plaintiff receives the recommended psychiatric and psychological treatment.   *Id.*

In passing, Plaintiff also suggests that the ALJ did not properly account for Plaintiff mental impairment in the hypothetical question posed to the VE; thus the testimony of the VE cannot for the basis of the ALJ's decision.   Doc. 18 at 11.   "[I]n order for a [vocational expert's] testimony to constitute substantial evidence, the ALJ must pose a hypothetical question to the vocational expert which comprises all of the

claimant's impairments." *Phillips*, 357 F.3d at 1240 n.7 (quotation marks omitted). "The hypothetical need only include the claimant's impairments, not each and every symptom of the claimant." *Ingram*, 496 F.3d, 1253, 1270 (11th Cir. 2007) (citation and quotation marks omitted). While an ALJ's hypothetical question must take into account all of a claimant's impairments, *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002), the question need not include impairments that the ALJ has properly determined to be unsupported by the evidence in the record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Here, the ALJ first asked the VE to assume an individual who can perform a full range of work at all exertional levels, with the following mental limitations:  can understand, remember and carry out simple, routine directions; can make judgments on simple work-related decisions; can have occasional interaction with the general public, coworkers and supervisors; may require direct non-confrontational supervision; and can adapt to infrequent workplace changes. Tr. 56-57. With those limitations, the ALJ asked the VE if Plaintiff could perform her past work, and the VE responded that she could not. Tr. 57. Upon further questioning by the ALJ, the VE further testified, however, that there were other jobs in the national or regional economy that Plaintiff could perform, and gave some examples. *Id.* When the ALJ added to the hypothetical that the individual could not perform production rate paced assembly, the VE still noted there were jobs such an individual could perform. Tr. 58. The Court finds that the ALJ took into account Plaintiff's mental impairments that were supported by substantial evidence when posing his hypothetical question to the VE. *Wilson*, 284

F.3d at 1227; *Crawford*, 363 F.3d at 1161.   Thus, substantial evidence supports the VE's testimony and the resulting RFC.

> b. *Whether the ALJ properly evaluated the opinions of Plaintiff's physicians*

Plaintiff next argues that the ALJ did not provide "good cause" for rejecting the opinions of Plaintiff's treating physicians with respect to their GAF assessments, and thus substantial evidence does not support the ALJ's RFC assessment.   Doc. 18 at 11. With respect to the opinion of consultative physician Dr. Bowman, Plaintiff also argues that by giving it "some weight" and only to the extent it was consistent with the RFC, the ALJ did not appear to account for the moderate to marked difficulty that Dr. Bowman assessed in Plaintiff coping with her stress or explain how Plaintiff would be capable of working despite her ability to manage her own funds.   Doc. 18 at 14; Tr. 459.

When determining how much weight to afford an opinion, the ALJ considers whether there is an examining or treatment relationship and the nature and extent thereof; whether the source offers relevant medical evidence to support the opinion; consistency with the record as a whole; the specialization of the source, if any; and any other factors that tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c)(1)-(6).   Under the regulations, opinions of treating sources usually are given more weight because treating physicians are the most likely to be able to offer detailed opinions of the claimant's impairments as they progressed over time and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."   20 C.F.R. § 404.1527(c)(2).   Medical source opinions may be discounted, however, when the opinion

is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole.   SSR 96-2p; *Crawford*, 363 F.3d at 1159-60.   Accordingly, "[a]n ALJ must give a treating physician's opinion substantial weight, unless good cause is shown."   *Castle v. Colvin*, 557 F. App'x 849, 854 (11th Cir. 2014) (citing *Phillips*, 357 F.3d at 1240); *Lewis*, 125 F.3d at 1440; *Sabo v. Chater*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996).   "Good cause exists when the '(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"   *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).   Findings of fact made by state agency medical and psychological consultants as to the nature and severity of a claimant's impairments must be treated as expert opinion evidence of nonexamining sources by the ALJ, but the ultimate opinions as to whether a claimant is disabled, the severity of a claimant's impairments, the claimant's RFC and the application of vocational factors are exclusively reserved to the Commissioner.   SSR 96-6p; 20 C.F.R. § 404.1527(d)(1)-(2). Unless a treating source's opinion is given controlling weight, the ALJ must explain the weight given to the opinions of other consultants, doctors or medical specialists.   20 C.F.R. § 404.1527(e)(2)(ii); *Vuxta v. Comm'r of Soc. Sec.*, 194 F. App'x 874, 877 (11th Cir. 2006).

Plaintiff primarily takes issue with the ALJ's giving little weight to Plaintiff's various GAF scores below 50 from physicians during Plaintiff's hospitalizations and treatment, and finding that the evidence, including Plaintiff's reports of her activities of daily living, show that her mental impairment does not more than moderately affect

her mental functioning for an extended period.   Doc. 18 at 11-14; Tr. 18-19.   But as discussed in detail in the previous section, the ALJ was not required to give GAF scores any special weight.

Moreover, the ALJ discussed his reasoning for giving little weight to Plaintiff's reported GAF scores: because the evidence demonstrated that Plaintiff's mental impairment does not more than moderately affect her mental functioning.   Tr. 19.   He noted that GAF scores are "an attempt to get a reading of the clinician's assessment of the patient's functioning and are useful in planning treatment."   Tr. 18-19. Significant here, a GAF score in and of itself, however, is not a medical opinion; and it does not translate into specific mental limitations or indicate what an individual can do despite mental limitations. See 20 C.F.R. §§04.1545(a), 416.945(a).   Moreover, as discussed in the previous section, although there are exceptions, generally when the record reflected Plaintiff was not taking her medication or following recommended treatment, her GAF scores were low.   *See, e.g.*, Tr. 264 (GAF of 55 on admission to inpatient treatment, noting Plaintiff would be "retarted" on Lexapro); Tr. 279 (GAF of 50 after gap of two months treatment); Tr. 297, 298 (GAF of 20 on admission to inpatient treatment one month following eight-month gap in treatment, improving to 50 upon discharge); Tr. 341 (GAF of 55 when off medication).   Conversely, when the record is clear that Plaintiff was compliant with her medication or recommended treatment follow-up or received treatment after noncompliance, her GAF scores significantly improved.   *See, e.g.*, Tr. 274, 276 (GAF of 60 on two occasions while taking Lexapro); Tr. 338 (GAF of 70 after four days of inpatient treatment).   There also were occasions in which the more positive reports of Plaintiff's treating physicians and Plaintiff's

reported symptoms of depression were inconsistent with the low GAF scores.   *See, e.g.,* Tr. 282, 290 (GAF of 45, yet Plaintiff reported feeling less depressed and physician made no medication change).

Instead of solely focusing on Plaintiff GAF scores, the ALJ properly considered Plaintiff's testimony, her daily activities, her medical history, and medical source opinions with respect to her alleged mental impairments, and determined that Plaintiff had the ability to work despite her mental limitations when she was compliant with her treatment.   Tr. 16-19.   The Court already has found that substantial evidence supports the ALJ's determination in this regard.

In terms of the psychological evaluation of Dr. Bowman, who was a consultative and not treating physician (Tr. 459), the ALJ gave the opinion significant weight because it was generally consistent with the evidence of record, including Dr. Conger's assessment and Plaintiff's longitudinal treatment history.   Tr. 18.   Plaintiff argues that the ALJ "does not appear to have accounted for the moderate to marked difficulty Dr. Bowman assessed in coping with stress, nor did he explain how Plaintiff would be capable of working despite being unable to even manage her own funds."   Doc. 18 at 14; Tr. 459.   As the Commissioner properly points out, however, the ALJ accounted for Plaintiff's limitations by limiting her RFC to simple, routine work involving few interactions and changes and only occasional interaction with the general public, supervisors and co-workers.   Doc. 19 at 14; Tr. 16.   The Court finds substantial evidence supports the ALJ's decision in this regard.

>   *c.  Whether the ALJ's credibility assessment of Plaintiff is supported by substantial evidence*

Plaintiff next contends that the ALJ erred in determining that her statements as to the intensity, persistence and limiting effects of her symptoms were not fully credible and in doing so, relying too heavily upon Plaintiff's basic activities of daily living and not properly crediting Plaintiff's mental health treatment records. Doc. 18 at 14-15.  The regulations require the ALJ to consider specific factors when making credibility determinations.  Those factors include the claimant's daily activities; the location, duration, frequency and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications; treatment other than medication; and any other measures to reduce pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).

SSR 96-7p further explains the process by which a claimant's credibility must be evaluated:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

*Id.*  A claimant's statements as to the intensity and persistence of pain or other symptoms, or how they affect her ability to work, may not be disregarded simply because they are not supported by objective medical evidence; instead, the ALJ must state specific reasons for his credibility determination and the weight given to subjective statements, which must be supported by the record.   20 C.F.R. § 404.1529(c)(4)

(subjective complaints are evaluated in relation to other evidence); SSR 96-7p; *Wilson*, 284 F.3d at 1225 ("If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.").

Here, the ALJ stated that Plaintiff's reported daily activities were not consistent with the severity of her alleged mental limitations.  Tr. 19.  Specifically, the ALJ noted that Plaintiff reported the abilities to care for herself and her dog, clean dishes, organize her house, spend time with her husband, watch television and drive.  Tr. 19. Moreover, as noted by the Commissioner, third party reports by Plaintiff's mother show that Plaintiff regularly prepared meals, left her home daily, used public transportation, shopped, handled her finances, and other daily activities.  Tr. 229-32; Doc. 19 at 17. Plaintiff's testimony concerning her daily activities also supports the ALJ's decision, in that she walks her dog three times daily, performs light exercise, organizes her home, cleans dishes, and watches television.  Tr. 51-53.

Daily activities are properly considered when evaluating complaints of disabling pain.  20 C.F.R. § 404.1529(c)(3)(i).  While the performance of everyday tasks cannot be used as the sole evidence to determine that Plaintiff is not disabled, Plaintiff's participation in such activities supports the ALJ's determination that she is capable of light work, with restrictions.  *See, e.g.*, *Graham v. Apfel*, 129 F.3d 1420, 421-22 (11th Cir. 1997) (finding that activities such as performing light housework and grocery shopping supported ALJ's determination that the plaintiff could perform light work); *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physician's testimony by pointing out the contrasts in the claimant's daily activities and the physician's diagnosis); *Wilson*, 284 F.3d at 1226

(upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because her daily activities demonstrated otherwise).

Furthermore, the ALJ did not rely solely upon Plaintiffs daily activities but also discussed in detail, as outlined herein, the medical records that suggest her severe mental health symptoms are controlled when she is compliant with medications and treatment. Tr. 16-19. Except for one occasion in February 2013 (Tr. 378), Plaintiff reported on several occasions to her treating physicians that the medications she was taking helped her condition. Tr. 273, 275, 277. Although the ALJ discussed Plaintiff's testimony that she did not follow treatment or medication recommendations because of the cost, he likewise noted the record was devoid of any evidence that Plaintiff made any effort to avail herself of any low cost options available through government or charitable resources. Tr. 17. Thus, this case is inapposite to cases in which claimants cannot afford the prescribed treatment and there is no other way to obtain it, and therefore would be excused from noncompliance. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). Unlike in this case, if an ALJ relies primarily, if not exclusively, on evidence of noncompliance with prescribed treatment to make an adverse credibility determination, he has erred. Here, as noted, noncompliance was not the ALJ's sole basis for the adverse credibility finding.

To the extent Plaintiff points to treatment notes that may contradict some portions of the evidence relied upon by the ALJ, "when there is credible evidence on both sides of an issue it is the Secretary, acting through the ALJ, and not the court, who is charged with the duty to weigh the evidence and to determine the case accordingly."

*Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984), citing *Richardson*, 402 U.S. at 389-403.

Therefore, upon a review of the full record, the Court finds that substantial evidence supports the ALJ's credibility determination. "The question is not . . . whether the ALJ could have reasonably credited [a claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011). The record reveals no reversible error in the ALJ's assessment of Plaintiff's credibility concerning the intensity and persistence of Plaintiff's symptoms and their limiting effects on Plaintiff's ability to work. The ALJ compared Plaintiff's statements with her daily activities, treatment and objective medical evidence, and found her statements to be only partially credible as reflected in the RFC. "A clearly articulated credibility finding with supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562. The Court declines to do so here.

### V.   Conclusion

Upon review of the record, the undersigned concludes that the ALJ applied the proper legal standards, and his determination that Plaintiff is not disabled is supported by substantial evidence.

ACCORDINGLY, it is hereby

**ORDERED:**

1.      The decision of the Commissioner is **AFFIRMED**.

2.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) in favor of the Commissioner, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on this 30th day of December, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:

Counsel of record